**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CARRIE R. FONSECA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-8353 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| KILOLO KIJAKAZI, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Carrie Fonseca is in her 50s, and she suffers from several health issues. She has diabetes, diabetic retinopathy, trigger finger, carpal tunnel, cubital tunnel syndrome, lumbar stenosis, obesity, and depression. In early 2016, she applied for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act.

An Administrative Law Judge denied Fonseca's claims three times, finding that she was not disabled. The third denial took place after an evidentiary hearing, where Fonseca testified. Eventually, Fonseca requested that the Appeals Council review the ALJ's decision. But the Appeals Council also denied her request, leaving the ALJ's ruling as the final decision of the Commissioner of Social Security.

Fonseca responded by filing suit against the Commissioner. She challenged the denial of her claim for Supplemental Security Income (but not the denial of her claim for Disability Insurance Benefits). The parties, in turn, filed cross motions for summary judgment.

For the reasons stated below, Plaintiff's motion for summary judgment is denied, and Defendant's motion for summary judgment is granted.

**Background**

Carrie Fonseca applied for Disability Insurance Benefits and Supplemental Security Income ("SSI") in early 2016. At first, Fonseca simply alleged that she was disabled, without specifying the nature of the disability. *See* Application Summary for Supplemental Security Income (Dckt. No. 10-1, at 187 of 876) ("I am disabled. My disability began on August 1, 2008.").[1]

At that point, Fonseca was only 44 years old, roughly two-thirds of the way to the traditional retirement age. *Id.* She had a high school education and a limited work history. *See* 11/6/2018 ALJ Decision (Dckt. No. 10-1, at 36 of 876); Work History Report (Dckt. No. 10-1, at 247 of 876). She worked as a cashier for a gas station between 1989–1999, and then as a cashier and sandwich maker at a deli for a year in the early 2000s. *See* Work History Report.

Fonseca hasn't held a job since August 2008. *Id.* Fonseca originally claimed that her disability began at that point. *See* Application Summary for Supplemental Security Income (Dckt. No. 10-1, at 187 of 876) (stating that her disability began on August 1, 2008).

As the proceeding unfolded, Fonseca submitted a large collection of medical records, spanning nearly 600 pages. Those medical records shed light on a wide assortment of health issues that Fonseca suffered over a span of a decade. *See* Medical Records (Dckt. No. 10-1, at 280–876 of 876). The health challenges included diabetes, diabetic retinopathy, trigger finger, carpal tunnel, cubital tunnel syndrome, lumbar stenosis, obesity, and depression. *Id.* at 432–534.

Administrative Law Judge Roxanne Kelsey denied Fonseca's claim initially in September 2016. *See* 11/6/2018 ALJ Decision (Dckt. No. 10-1, at 27 of 876). Fonseca requested

---

[1] When citing the Administrative Record in this Memorandum Opinion, the page numbers refer to the page numbers in the header of the ECF filing, not the page numbers in the lower right corner of the document itself. So, for example, this particular passage appears on page 187 of 876 of the Administrative Record, with a page number of 183 in the lower right corner.

reconsideration, and the ALJ denied the application a second time in March 2017. *Id.* Fonseca then requested a hearing in front of the ALJ. *Id.*

The ALJ presided over a hearing on July 10, 2018, and Fonseca appeared and testified about her medical conditions. *Id.* A vocational expert, Mary Harris, also testified. *Id.* At the hearing, Fonseca amended her alleged disability onset date, moving it by seven and a half years from August 1, 2008 to February 16, 2016. *Id.*; *see also* 7/10/2018 Tr. (Dckt. No. 10-1, at 47–50 of 876). She also dropped her Disability Insurance Benefits claim. *See* 11/6/2018 ALJ Decision (Dckt. No. 10-1, at 27 of 876).

Fonseca testified about her work history and her health. She explained that she hadn't worked in years because of her health issues. *See* 7/10/2018 Tr. (Dckt. No. 10-1, at 52 of 876). And Fonseca testified that she had diabetes, diabetic retinopathy in both eyes, diabetic trigger finger in her right hand, diabetic neuropathy in her right leg, carpal tunnel in both arms, and back issues. *Id.* At the hearing, Fonseca wore a wrist splint. *Id.* at 54. The ALJ asked about the splint, and Fonseca explained that she had been wearing it for a week, but it was too early to tell if the splint helped. *Id.*

The ALJ also asked Fonseca about her living conditions and her ability to complete daily tasks. *Id.* at 54–55. The ALJ asked how she got around town, too. *Id.* Fonseca explained that she lived with her boyfriend and mother, and traveled locally by using the bus. *Id.*

When asked about driving, Fonseca explained that she had never driven. *Id.* at 55. She initially "didn't have the confidence to get behind the wheel." *Id.* And later, her eyes were "shot," making driving difficult. *Id.*

Fonseca also testified about having difficulty with everyday tasks like laundry, shopping, and cooking. *Id.* at 55–56. She explained that her carpal tunnel and trigger finger made it hard

3

to fold and carry laundry. *Id.* at 56. She had to use automated carts to get around stores, and she had issues holding utensils to cook. *Id.* Despite her health issues, Fonseca testified that she still enjoyed being social with others and watching TV. *Id.* at 58–59.

Finally, the ALJ talked to Fonseca about her ability to lift, stand, walk, and sit. *Id.* at 61. Fonseca said she could lift and carry up to five pounds, stand for around half an hour, walk a block, and sit for 15–20 minutes. *Id.* at 61–62. She later elaborated that she walks with a limp and cannot walk with a cane because of her grip issues. *Id.* at 62.

The vocation expert also testified, explaining what jobs Fonseca might be able to perform depending on various limitations. *Id.* at 65–70. At the end of the hearing, Fonseca's counsel and the ALJ discussed the possibility of a consultative examination ("CE") if the ALJ determined that she did not have enough evidence to decide whether Fonseca was disabled. *Id.* at 70–72. Counsel suggested that a CE might be helpful, and the ALJ explained that she would review the whole record and then consider if there was a need for more testing.

Ultimately, the ALJ did not order a CE. Instead, the ALJ ruled that Fonseca was not disabled within the meaning of the Social Security Act. *See* 11/6/2018 ALJ Decision (Dckt. No. 10-1, at 27, 37 of 876). A person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *See* 42 U.S.C. § 423(d)(1)(a).

Before arriving at her decision, the ALJ walked through the five steps required by 20 C.F.R. § 416.920. *See* 11/6/2018 ALJ Decision (Dckt. No. 10-1, at 27–31 of 876). An ALJ must determine whether the claimant: (1) is presently unemployed, (2) has a severe impairment, (3) has an impairment or combination of impairments that meets or medically equals one of a list

4

of specific impairments enumerated in the regulations, (4) is unable to perform her former occupation, and (5) is unable to perform any other work. *See* 20 C.F.R.        § 416.920(a)(4).

"An affirmative answer at either step three or step five leads to a finding that the [claimant] is disabled." *Dennis K. v. Kijakazi*, 2021 WL 4819508, at *1 (N.D. Ill. 2021) (citing *Young v. Sec'y of Health & Hum. Servs.*, 957 F.2d 386, 389 (7th Cir. 1992)). And "[a] negative answer at any step, other than at step three, precludes a finding of disability." *Id.*

At step one, the ALJ found that Fonseca was currently unemployed and had not engaged in substantial gainful activity since February 16, 2016, the alleged disability onset date. *See* 11/6/2018 ALJ Decision (Dckt. No. 10-1, at 30 of 876). So Fonseca got past step one.

At step two, the ALJ concluded that Fonseca had a severe impairment. Specifically, the ALJ found that Fonseca had the following medically determinable impairments: "diabetes with diabetic retinopathy, lumbar stenosis, trigger finger, pain in elbow and trigger finger, carpal tunnel syndrome and ulnar motor neuropathy across the elbows consistent with cubital tunnel syndrome." *Id.* The ALJ found that these physical impairments significantly limited her ability to perform basic work activities. *Id.* So Fonseca got past step two.[2]

At step three, the ALJ concluded that Fonseca's impairments, alone or in combination, did not meet or medically equal the severity of a listed impairment in the applicable regulations. *Id.* at 31–32; *see also* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. In other words, Fonseca's impairments were not so severe to automatically qualify her as disabled.

The ALJ's finding that Fonseca did not satisfy step three did not doom her claim. The ALJ also considered whether Fonseca satisfied steps four and five, which provides a second potential route for a finding of a disability.

---

[2] The ALJ also considered Fonseca's depression, finding that it only minimally limited her ability to perform mental work activities and thus was non-severe. *Id.*

5

Before step four, the ALJ found that Fonseca had the residual functional capacity to perform light work with the additional limitations of "no climbing ladders, ropes or scaffolds; frequent stooping, kneeling, crouching, or crawling; and occasional fine manipulation with either upper extremity." *See* 11/6/2018 ALJ Decision (Dckt. No. 10-1, at 32 of 876). The ALJ came to that conclusion after considering all symptoms. Specifically, the ALJ looked at whether Fonseca had an underlying medically determinable impairment, and considered the intensity, persistence, and limiting effects of her symptoms. *Id.*

In explaining her decision, the ALJ discussed Fonseca's impairments, medical records, and testimony. *Id.* at 32–33. The ALJ found that Fonseca's statements about the intensity, persistence, and limiting effects of her symptoms were inconsistent because medical evidence did not support the alleged loss of functioning. *Id.* at 33. The ALJ stated that "her claims of debilitating back and hand pain (trigger finger pain) are not consistent with the treatment records. Although she has diabetes, her trigger finger pain only worsened this year and is accommodated with the manipulative limitations provided." *Id.*

According to the ALJ, Fonseca's "current/newer limitations" could improve with treatment. *Id.* In particular, the ALJ noted that Fonseca previously stopped attending physical therapy due to scheduling issues. *Id.* Some of her limitations had only recently begun. *Id.* The ALJ also noted that Fonseca's treatments had been conservative and that further treatment could improve her symptoms. *Id.* at 33–35. The ALJ pointed out that occupational therapy improved Fonseca's symptoms in the past, and could do so again. *Id.* at 36.

Along the way, the ALJ noted that the medical evidence was at odds with parts of Fonseca's claims. For example, Fonseca testified that she walked with a limp, and cannot use a cane, walk, or stand for long periods. *Id.* But according to her medical records, Fonseca's gait

6

had been normal, and she could walk three miles at least twice a week. *Id.* at 33–34 ("[T]here is no objective evidence to support the claim that she walks with a limp, cannot use a cane, and has fallen before, but not often. The claimant's gait has been normal throughout the record. . . . [T]he record documents that she was walking 3 miles at least 2 times a week."). Additionally, while Fonseca said her eyes were shot, her medical records showed that her visual acuity was corrected to 20/40 in both eyes. *Id.* That's good enough for driving. *Id.*

Based on the record, the ALJ found that Fonseca could perform light work with occasional fine manipulation. *Id.* at 35. The ALJ also imposed limitations on climbing, stooping, kneeling, crouching, and crawling in light of her back and finger pain. *Id.* at 34–35 ("The limitation of no climbing ladders, ropes or scaffolds is not only necessary because of her back pain, but it is also a safety precaution due to her finger pain.").

At step four, the ALJ found that Fonseca did not have any past relevant work experience. *Id.* at 36. Step four asks whether the claimant could perform work that is consistent with past relevant work experience. But here, she had none. So she cruised past step four, too.

Finally, at step five, the ALJ found that Fonseca could perform other work. The ALJ found that there are jobs in the national economy that Fonseca can perform based on her age, education, work experience, and residual functional capacity. *Id.* After considering the fact that Fonseca was a "younger individual" with a high school education and had residual functional capacity, the ALJ found that Fonseca could perform jobs such as bakery line worker, shipping and receiving weigher, and recreational aide. *Id.* at 37.

In the end, the ALJ found that Fonseca could work, and concluded that she "has not been under a disability." *Id.* So the ALJ denied her claim. *Id.*

Later, Fonseca requested that the Appeals Council review the ALJ's decision. *See* Notice of Appeals Council Action (Dckt. No. 10-1, at 5 of 876). The Appeals Council denied her request, leaving the ALJ's decision as the final decision of the Commissioner of Social Security. *Id.*

Fonseca ultimately filed suit against the Commissioner, challenging the denial of her claim. *See* Cplt. (Dckt. No. 1). The parties filed cross motions for summary judgment.[3]

**Legal Standard**

When the Social Security Appeals Council denies a claimant's request for review, "the ALJ's decision becomes the final decision of the [Commissioner]." *See Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). The claimant may seek review of a final decision in federal district court, but the reviewing court's role is "extremely limited." *See Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009).

A court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." *See* 42 U.S.C. § 405(g). But the reviewing court "may reverse the Commissioner's final decision only if it is not supported by substantial evidence or is based on a legal error." *Hopgood v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009); *see also Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003) (noting that "[t]his is a deferential but not entirely uncritical standard").

"Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *See Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Biestek v. Berryhill*, 139 S.

---

[3] Instead of responding to Plaintiff's motion for summary judgment, Defendant filed his own motion for summary judgment. *See* Def.'s Mtn. (Dckt. No. 27). This Court issued an Order treating Defendant's motion as Defendant's response to Plaintiff's motion. *See* 9/17/20 Order (Dckt. No. 29). So it served double duty.

Ct. 1148, 1154 (2019). A "mere scintilla" of evidence is not enough. *See Biestek*, 139 S. Ct. at 1154; *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Instead, the ALJ "must build a logical bridge from the evidence to h[er] conclusion." *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013).

While the standard of review is deferential, a reviewing court must still "conduct a critical review of the evidence" when deciding whether to affirm the Commissioner's decision. *See Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008) (cleaned up). But a federal district court does not stand in the ALJ's shoes.

A reviewing court may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, if "the ALJ's decision used the correct legal standards, is supported by substantial evidence, and builds an accurate and logical bridge from the evidence to the ALJ's conclusion," then a district court must affirm it, even if reasonable minds could differ. *See Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020); *see also Elder*, 529 F.3d at 413.

### Analysis

Fonseca makes three arguments for reversing and remanding the Commissioner's decision. First, she says that the ALJ erred in failing to order a consultative exam. *See* Pl.'s Mem., at 6–9 (Dckt. No. 20). Second, she argues that the ALJ erred when evaluating her residual functional capacity. *Id.* at 9–12. And third, she contends that the ALJ erred in evaluating her subjective allegations. *Id.* at 12–15.

The Court will consider each argument in turn.

9

I. **Consultative Examination**

First, Fonseca argues that the ALJ erred by failing to order a consultative examination ("CE"). A CE "is a physical or mental examination or test" that the agency can purchase for the claimant. *See* 20 C.F.R. § 416.919. "The decision to purchase a consultative examination will be made on an individual case basis in accordance with" the governing regulations. *Id.*

Section 416.919a outlines situations when the Social Security Administration *might* purchase a CE. *See* 20 C.F.R. § 416.919a. The language is heavily flavored with discretion: "If we cannot get the information we need from your medical sources, we *may* decide to purchase a consultative examination." *See* 20 C.F.R. § 416.919a(a) (emphasis added). The helping verb is "may," not "must."

The regulation describes "[s]ituations that may require a consultative examination." *See* 20 C.F.R. § 416.919a(b) (listing a number of examples). For example, the Administrator "may purchase a consultative examination to try to resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to support a determination or decision on your claim." *Id.* The agency might purchase a CE when "additional evidence needed is not contained in the records of [the claimant's] medical sources." *See* 20 C.F.R. § 416.919a(b)(1). And the agency might purchase a CE when "[t]here is an indication of a change in [the claimant's] condition that is likely to affect [their] ability to work . . . but the current severity of [the] impairment is not established." *See* 20 C.F.R. § 416.919a(b)(4). The regulation gives other examples, too.

Even if the ALJ did order a CE, the claimant would not necessarily undergo every medical test under the sun. It depends on what the ALJ believes would be helpful. "We will purchase only the specific examinations and tests we need to make a determination in your claim. For example, we will not authorize a comprehensive medical examination when the only

evidence we need is a special test, such as an X-ray, blood studies, or an electrocardiogram." *See* 20 C.F.R. § 416.919f.

Fonseca believes that the ALJ made a mistake by failing to order a CE. According to Fonseca, a CE would have provided information to properly assess the severity and duration of her impairments, specifically her upper extremity impairments. *See* Pl.'s Mem., at 10 (Dckt. No. 20). As Fonseca sees it, by failing to order a CE, the ALJ deprived herself of the information that she needed to rule on the claim.

An ALJ has the duty to develop a full and fair record, but that duty is not limitless. *See Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014). An ALJ does not have to gather any and all medical evidence that might conceivably lend a hand. An ALJ does not have to turn over every stone, and go down every rabbit hole. In particular, an ALJ has latitude when deciding how far to drill down.

"[R]eviewing courts defer to the ALJ's judgment as to when further inquiry[, like a CE,] is warranted." *See Hosea M. v. Saul*, 2019 WL 5682835, at *11 (N.D. Ill. 2019) (citing *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009)); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled."); *see also Poyck v. Astrue*, 414 F. App'x 859, 861 (7th Cir. 2011). In fact, an ALJ is "not required to order [consultative] examinations, but may do so if an applicant's medical evidence about a claimed impairment is insufficient." *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007). Normally, a CE is "required if the evidence is ambiguous, if specialized medical evidence is required but missing from the record, or if there is a change in a condition but the current severity of the impairment is not

established." *See Poyck*, 414 F. App'x at 861 (citing 20 C.F.R. § 416.919a(b)). An ALJ decides what paths to follow, and how far to go.

Particularly where the claimant is represented by counsel, "the burden is on the claimant to introduce some objective evidence that further development of the record is required." *Id.* If the ALJ denied the request for a CE, "on appeal the claimant must show prejudice by pointing to specific medical evidence that was omitted from the record." *Id.* (citing *Nelms*, 553 F.3d at 1098). "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994).

Here, the ALJ had an adequate record, and then some. Fonseca submitted over 600 pages of medical records, including records from her primary care physician assistant, occupational therapists, ophthalmologists, a neuroradiologist, and a neurologist. *See, e.g.*, Medical Records (Dckt. No. 10-1, at 431–69 of 876) (physician assistant); *id.* at 499 (occupational therapists); *id.* at 364–430, 490–98, 694 (ophthalmologists); *id.* at 489, 532 (neuroradiologist); *id.* at 769 (neurologist). Additionally, the record included the opinion of two state reviewing physicians. *Id.* at 75–84, 100–113. The ALJ had in hand a hefty collection of medical records.

Despite this record, Fonseca argues that the ALJ did not have enough medical evidence about Fonseca's newer limitations – specifically bilateral carpal tunnel and cubital tunnel syndromes – to make her decision. *See* Pl.'s Mem., at 7 (Dckt. No. 20) (citing 20 C.F.R. §§ 416.919a(b)(1), 416.919a(b)(4)).

The record confirms that the ALJ carefully considered the issue. At the hearing, Fonseca's counsel raised the possibility of obtaining a CE, adding that it might be helpful. *See* 7/10/2018 Tr. (Dckt. No. 10-1, at 71 of 876). The ALJ promised to "look over everything more

thoroughly," and then added that she "rarely send[]s people out for CEs because it does" prolong things. *Id.*

The ALJ added: "I'm going to look over everything more carefully after the hearing." *Id.* The ALJ reiterated that she would carefully read the record, and the decided if there was a need for more testing. "I don't know right now what I'm going to do because I've got to read everything more carefully and see what else comes in. But if I decide I don't have enough, then we'll send you to a CE." *Id.*

The ALJ ultimately decided that there was no need for more testing. That conclusion flowed from the comprehensiveness of the medical evidence that was already in the record. The ALJ had medical records on all of Fonseca's impairments, including her newer impairments. Specifically, the ALJ had medical records documenting the electromyograph that diagnosed Fonseca's carpal tunnel and cubital tunnel syndromes, along with occupational therapy reports documenting treatment of those impairments. *See* Medical Records (Dckt. No. 10-1, at 773–74, 862–63 of 876).

And the ALJ had the latest information, too. Fonseca's diagnoses were six months old at the time of the hearing, and her occupational therapy reports were just days old. *Id.* It's true that the state reviewing physicians completed their reviews before Fonseca's carpal tunnel and cubital tunnel syndrome diagnoses. So those diagnoses were not included in their opinions. But the ALJ had Fonseca's later medical records on the newer impairments to fill in the gaps. This is not a case where the ALJ lacked medical records, or where the records were ambiguous. The ALJ had ample records noting all of Fonseca's impairments.

Similarly, this is not a case where Fonseca's condition changed, and the ALJ didn't have evidence about the severity of that condition. Instead, her medical records and occupational

reports detailed the severity of her new carpal tunnel and cubital tunnel syndrome diagnoses. *Id.* at 773 (explaining that her carpal tunnel is worse on her right side and her cubital tunnel syndrome is worse on her left side); *id.* at 862–63. After surveying the record, the ALJ concluded that there were no meaningful gaps to fill.

CEs can be useful. After all, at the hearing the ALJ explained the value of CE, telling Fonseca that during a CE a doctor would "look at everything, a doctor [would] look at [her] whole body . . . not just little bits." *See* 7/10/2018 Tr. (Dckt. No. 10-1, at 71 of 876). But the ALJ did not have a duty to order a CE. ALJs turn to CEs when a claimant's medical records are insufficient. The ALJ specifically told Fonseca that she would only order a CE after reading through the entire record and deciding if she had enough medical evidence to make her decision. *Id.* at 73. After looking through hundreds of pages of evidence, including medical records about each of Fonseca's impairments, the ALJ decided that the record was sufficient.

In sum, where, as here, the record contained enough information for the ALJ to make a decision, the ALJ did not have an obligation to order a CE. *See Skinner*, 478 F.3d at 843–44.

## II. Residual Functional Capacity

Second, Fonseca argues that the ALJ erred in evaluating her residual functional capacity. *See* Pl.'s Mem., at 9 (Dckt. No. 20).

As the name suggests, the residual functional capacity "is an assessment of what work-related activities the claimant can perform despite her limitations." *See Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. § 416.945(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."). More specifically, it "is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or

14

restrictions that may affect his or her capacity to do work-related physical and mental activities." *See* Social Security Ruling 96-8p, 1996 WL 374184, at *2 (1996).

An ALJ's assessment of residual functional capacity "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. And the ALJ must explain how she reached her conclusions about a claimant's physical capabilities, building an "accurate and logical bridge from the evidence to the conclusion." *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

Again, the ALJ found that Fonseca had the residual functional capacity to perform light work and imposed limitations on climbing ladders, ropes, or scaffolds, and imposed limitations on frequent stooping, kneeling, crouching, or crawling. *See* 11/6/2018 ALJ Decision (Dckt. No. 10-1, at 32 of 876). The ALJ also found that Fonseca could only perform occasional fine manipulation with either upper extremity. *Id.*

Fonseca believes that the ALJ made a few mistakes. Specifically, Fonseca argues that the ALJ should have (1) specified how much sitting, standing, walking, lifting, or carrying she could perform; (2) limited her to sedentary work; (3) imposed visual restrictions; and (4) limited her to occasional fine handling. *See* Pl.'s Mem., at 9–12 (Dckt. No. 20). The Court will address each alleged mistake, one at a time.

### A.     Function-by-Function Assessment of Residual Functional Capacity

First, Fonseca argues that the ALJ failed to include a function-by-function assessment of her residual functional capacity. *Id.* at 9. According to Fonseca, the ALJ should have specified "how much sitting, standing, walking, lifting, or carrying Ms. Fonseca could do." *Id.*

To support her argument, Fonseca rests on Social Security Ruling 96-8p. *Id.*; *see also* Social Security Ruling 96-8p, 1996 WL 374184, at *5 (1996). In the ruling, the Administrator clarified how an ALJ should assess residual functional capacity when evaluating a claim for disability benefits.

Ruling 96-8p "emphasizes that an ALJ must identify an individual's functional limitations before expressing the [residual functional capacity] in terms of exertional levels (i.e., sedentary, light, medium, heavy, and very heavy)." *See Jeske v. Saul*, 955 F.3d 583, 595 (7th Cir. 2020). "It goes on to say that the adjudicator's assessment must address the claimant's exertional and non-exertional capacities, and that exertional capacity 'defines the individual's remaining abilities to perform each of seven strength demands: [s]itting, standing, walking, lifting, carrying, pushing, and pulling.'" *Id.* (quoting Social Security Ruling 96-8p, 1996 WL 374184, at *5 (1996)).

But Ruling 96-8p does not impose a rigid requirement upon the ALJ to separately write about each of the seven strength functions. "[A] decision lacking a seven-part function-by-function written account of the claimant's exertional capacity does not necessarily require remand." *Id.* (citing cases from the Second, Fourth, Eighth, Ninth, and Tenth Circuits). If the court "can tell that the ALJ considered the claimant's ability to perform all seven functions, we need not remand to have the ALJ better articulate its analysis on the claimant's exertional capacity." *Id.*

Here, the ALJ discussed Fonseca's subjective testimony and her medical records about the seven strength functions. *See* 11/6/2018 ALJ Decision (Dckt. No. 10-1, at 32–34 of 876). For example, she noted that Fonseca testified about difficulties with "her ability to walk and stand," that she could only "lift/carry a few pounds, stand 20-30 minutes, walk one block before

needing to rest, and sit 15 to 20 minutes at a time." *Id.* at 32–33. The ALJ also noted medical evidence contravening Fonseca's testimony about her strength functions. *Id.* at 33–34 (noting medical evidence showing that Fonseca "was walking 3 miles at least 2 times a week" and that she could engage in housework, shop, and attend appointments alone).

That narrative discussion is sufficient. *See Knox v. Astrue*, 327 F. App'x 652, 656 (7th Cir. 2009) ("Although the 'RFC assessment is a function-by-function assessment,' SSR 96-8p, the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient."). So, there is no reason to reverse and remand for a clearer articulation of Fonseca's functional limitations.

## B. Exertional Level

Second, Fonseca argues that the ALJ should have limited her to sedentary work, instead of light work. *See* Pl.'s Mem., at 10 (Dckt. No. 20). Specifically, Fonseca says that "[h]ad the ALJ properly considered [her] difficulties with walking, she may have reduced [Fonseca's] standing and walking tolerance to two hours a day, consistent with sedentary work." *Id.* at 11–12.

When it comes to reviewing the ALJ's decisions, this Court's job is not to "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *See Elder*, 529 F.3d at 413. Instead, this Court looks to whether the ALJ used the correct legal standards, supported the decision by substantial evidence, and built an accurate and logical bridge from the evidence to the conclusion. *Id.*; *see also Jeske*, 955 F.3d at 587. If the ALJ did so, then the Court must affirm the decision, even if reasonable minds could differ. *See Elder*, 529 F.3d at 413.

Fonseca argues that the ALJ didn't have substantial evidence to find that she could perform light work. She points to the ALJ's findings on her ability to walk. *See* Pl.'s Mem., at 10 (Dckt. No. 20). The ALJ found that "[a]lthough the claimant testified that she can only stand or walk for a short time, the record documents that she was walking at least two times a week." *Id.* According to Fonseca, this finding failed to consider "whether [Fonseca's] ability to walk either fluctuated or had worsened" and was at odds with Fonseca's testimony that she could only stand or walk for short periods of time. *Id.*

But the ALJ supported her finding with substantial evidence and built a logical bridge from the evidence to her conclusion. The ALJ relied on the state agency reviewing physicians' opinions that Fonseca could perform light levels of work. *See* 11/6/2018 ALJ Decision (Dckt. No. 10-1, at 34, 36 of 876). The ALJ also considered a March 2017 physical therapy note reporting that Fonseca could walk three miles, two times per day. *Id.* None of Fonseca's doctors stated that she was *more* restricted in her walking and standing.[4]

Fonseca is correct that she testified that she was more limited in her ability to walk and stand. Recall, she testified that she could stand for around half an hour and walk only one block. *Id.* at 61–62. But "[a]n ALJ may disregard a claimant's testimony where it conflicts with medical testing, contemporaneous reports made to physicians, and independent observations." *Betty J. v. Saul*, 2020 WL 2557348, at *7 (N.D. Ill. 2020) (citing *Burmester v. Berryhill*, 920 F.3d 507, 510–11 (7th Cir. 2019); *Schloesser v. Berryhill*, 870 F.3d 712, 721–22 (7th Cir. 2017)).

---

[4] Fonseca points to an April 2017 physical therapy note indicating that one of Fonseca's goals was to increase her walking tolerance to more than 1.5 miles. *See* Pl.'s Mem., at 10 (Dckt. No. 20); Medical Records (Dckt. No. 10-1, at 777 of 876). However, that same note indicates that the occupational therapist could not assess Fonseca's goals because of "scheduling issues." *See* Medical Records, at 777. So the Court does not have any information from the occupational therapist, or any other doctor, about whether Fonseca could only walk 1.5 miles.

The ALJ pointed to multiple medical reports that indicated that Fonseca could walk and stand for longer periods. The ALJ used those reports to build a bridge from the medical evidence to her determination that Fonseca can perform light work. In sum, the ALJ's determination of light work is supported by substantial evidence.

### C.    Visual Limitations

Third, Fonseca argues that the ALJ erred by failing to include visual restrictions – above and beyond limitations on climbing ladders, ropes, or scaffolds – in the residual functional capacity determination. *See* Pl.'s Mem., at 10 (Dckt. No. 20).

When addressing Fonseca's residual functional capacity, the ALJ discussed her diabetes and diabetic retinopathy. *See* 11/6/2018 ALJ Decision (Dckt. No. 10-1, at 34 of 876). The ALJ explained that Fonseca's visual acuity had been corrected to 20/40, a correction that is "adequate for driving." *Id.* at 33–34. The ALJ also explained that Fonseca's ophthalmologist found sub clinical fluid in her eyes and noted that her vision could fluctuate based on her sugar levels. *Id.* at 34. After explaining the symptoms, the ALJ determined that she didn't need to include visual restrictions in light of the medical records, especially given that Fonseca "did not testify to having any other vision limits." *Id.*

But Fonseca believes that the ALJ overlooked important evidence. Fonseca says that the ALJ failed to consider that "she had difficulty preparing food and was paranoid of falling" and that Fonseca "complained of symptoms including blurry vision, large floaters, throbbing pain, fluid, and a white glow in both eyes, and received several Avastin injections, bilaterally, for that condition." *See* Pl.'s Mem., at 11 (Dckt. No. 20). According to Fonseca, the ALJ should have considered Fonseca's visual limitations that could cause her to be a hazard to herself or others. *Id.*

19

For support, Fonseca points to Social Security Ruling 83-14, which states that visual impairments that could cause "the person to be a hazard to self and others – usually a constriction of visual fields rather than a loss of acuity – the manifestations of tripping over boxes while walking, inability to detect approaching persons or objects, difficulty in walking up and down stairs, etc., will indicate to the decisionmaker that the remaining occupational base is significantly diminished for light work (and medium work as well)." *See* Social Security Ruling 83-14, 1983 WL 31254, at *5 (1983). According to Fonseca, she posed a hazard to herself and others because she struggled to prepare food, feared falling, and had other visual issues. And she believes that the ALJ should have taken into account whether she was a hazard. *See* Pl.'s Mem., at 11 (Dckt. No. 20).

But the visual impairments suggested by Fonseca's medical records and her testimony are hardly the type or severity contemplated in Ruling 83-14. Fonseca's vision problems aren't especially problematic. As the ALJ noted, Fonseca's visual acuity was corrected to 20/40. *See* 11/6/2018 ALJ Decision (Dckt. No. 10-1, at 34 of 876). And Fonseca's medical records from her ophthalmologist – which the ALJ referenced – repeatedly state that Fonseca had a "normal, full" visual field. *See e.g.*, Medical Records (Dckt. No. 10-1, at 702, 706 of 876).

Fonseca points to statements made in Social Security Administration functional reports that she was paranoid of falling and had difficulty cooking due to her vision. But her testimony at the hearing undercut these statements. *See* Social Security Administration Functional Reports (Dckt. No. 10-1, at 234, 257 of 876). The ALJ specifically asked Fonseca if she had problems cooking. *See* 7/10/2018 Tr. (Dckt. No. 10-1, at 56 of 876). Fonseca responded: "It's – again, just holding the utensils to cook." *Id.* She made no mention of any difficulty seeing.

Similarly, Fonseca's counsel questioned her about her history of falling. *Id.* at 63. Fonseca explained that she had fallen recently after tripping on the edge of the bed. But again, she made no mention of visual difficulties. *Id.* She complains that the ALJ did not "ask if she had any problems seeing." *See* Pl.'s Mem., at 11 (Dckt. No. 20). But the ALJ asked open ended questions, giving Fonseca the opportunity to answer as she saw fit. The ALJ isn't to blame if she threw her a softball question, and Fonseca didn't put the ball in play.

The medical records similarly lack support for her argument about her vision. The state agency reviewing physicians – as well as Fonseca's own doctors – did not identify any limitations based on Fonseca's vision. *See Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018) ("There is no error when there is 'no doctor's opinion contained in the record [that] indicated greater limitations than those found by the ALJ.'") (quoting *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004)).

In sum, the ALJ sufficiently discussed Fonseca's vision issues before concluding that the only necessary limitation involved climbing ladders, ropes, or scaffolds. There was an ample evidentiary basis in the record for the ALJ's decision, so there is no reason to set it aside.

### D.    Handling Limitations

Finally, Fonseca argues that the ALJ should have limited her to occasional – as opposed to frequent – handling. *See* Pl.'s Mem., at 12 (Dckt. No. 20). The Social Security Administration has explained that "handling (seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands) [is] required in almost all jobs" and "[s]ignificant limitations of . . . handling, therefore, may eliminate a large number of occupations a person could otherwise do." *See* Social Security Ruling 85–15, 1985 WL 56857, at *6 (1985); *see also Herrmann v. Colvin*, 772 F.3d 1110, 1112 (7th Cir. 2014). Recall, the ALJ limited

Fonseca to occasional manipulation, but did not specifically limit Fonseca's handling. *See* 11/6/2018 ALJ Decision (Dckt. No. 10-1, at 32 of 876).

As an initial matter, Fonseca's argument seems to be splitting hairs. The Social Security Administration considers handling restrictions as a *type* of manipulation restriction. *See, e.g.*, Social Security Ruling 96-8p, 1996 WL 374184, at *6 (1996) ("[Nonexertional capacity] assesses an individual's abilities to perform physical activities such as postural (e.g., stooping, climbing), *manipulative* (e.g., reaching, *handling*) . . . .") (emphasis added); Social Security Ruling 85-15, 1985 WL 56857, at *6–7 (1985) (describing handling as a "Postural-Manipulative Impairment[]"); *see also* 20 C.F.R. §§ 404.1545(b), 416.945(b) (explaining that in a residual functional capacity assessment an ALJ assesses physical function including "manipulative or postural functions, such as reaching, handling, stooping or crouching"); 20 C.F.R. §§ 404.1569a(c)(1)(vi), 416.969a(c)(1)(vi) ("You have difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching."). Here, the ALJ broadly restricted Fonseca's "manipulation" to occasional. Handling is a type of manipulation, so by restricting manipulation, the ALJ seemingly (or at least could have) restricted handling.

Even assuming that there is a difference between manipulation and handling, Fonseca's argument doesn't get her very far. Even if the ALJ had expressly limited her to occasional handling, there are jobs in the national economy that Fonseca can perform. Specifically, the position of bakery line worker (DICOT #524.687-022) (45,000 jobs nationally) only requires occasional handling. *See* Bakery Worker, Conveyor Line DICOT #524.687-022, 1991 WL 674401. While the bakery line worker does require light work, this Court already determined that substantial evidence supports the ALJ's determination that Fonseca can perform light work.

22

Fonseca further argues that she cannot perform the bakery line worker position because her vision issues would make it difficult for her to detect defects and walk around a conveyor belt. *See* Pl.'s Mem., at 12 (Dckt. No. 20). But as already discussed, the ALJ did not err by failing to find further visual limitations. And Fonseca does not explain how a person with visual restrictions could not perform the bakery line worker position. People with imperfect vision can spot imperfect baked goods. (This Court's grandma was a good example.)

\*        \*        \*

In sum, Fonseca makes four arguments related to the ALJ's residual functional capacity assessment. But none of them move the needle. The ALJ did not have to pin down exactly how much sitting, standing, walking, lifting, or carrying she could perform. *See Jeske*, 955 F.3d at 595. Substantial evidence supports the ALJ's finding that Fonseca could perform light work, and the ALJ's the decision not to impose visual restrictions. And even if the ALJ had limited Fonseca to occasional handling, there are jobs in the national labor market, specifically a bakery line worker, that Fonseca could perform. As a result, the ALJ did not err in the residual functional capacity analysis.

## III.    Subjective Allegations

Finally, Fonseca argues that the ALJ erred in evaluating her subjective allegations about the intensity, persistence, and limiting effects of her pain and symptoms. *See* Pl.'s Mem., at 12 (Dckt. No. 20). Fonseca takes issue with the ALJ's findings related to her claims of back and hand pain, walking with a limp, inability to use a cane, and vision issues. *Id.* at 12–15.

A two-step process governs the evaluation of a claimant's description of her pain and symptoms. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's

symptoms, such as pain." *See* Social Security Ruling 16-3p, 2016 WL 1119029, at *2 (2016).

"Second, once an underlying physical or mental impairment(s) that could reasonably be expected

to produce the individual's symptoms is established, [the ALJ] evaluate[s] the intensity and

persistence of those symptoms to determine the extent to which the symptoms limit an

individual's ability to perform work-related activities[.]" *Id.*

In evaluating the claimant's subjective symptoms, "an ALJ must consider several factors,

including the claimant's daily activities, her level of pain or symptoms, aggravating factors,

medication, treatment, and limitations, and justify the finding with specific reasons." *See Villano*

*v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (citations omitted); *see also* 20 C.F.R.

§ 416.929(c)(3); Social Security Ruling 16-3p, 2016 WL 1119029, at *7 (2016). An ALJ may

not discredit a claimant's testimony about her symptoms "solely because there is no objective

medical evidence supporting it." *See Villano*, 556 F.3d at 562. Even if a claimant's symptoms

are not supported directly by the medical evidence, the ALJ may not ignore circumstantial

evidence (medical or lay) that supports a claimant's credibility. *See Lopez ex rel. Lopez v.*

*Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003).

That said, an ALJ's evaluation of symptoms does not need to be flawless, and it is

entitled to great deference. The ALJ, unlike the reviewing court, has the ability to observe the

claimant, weigh credibility, and assess the believability of the descriptions of the symptoms. *See*

*Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014). The hearing officer saw and heard the

claimant, but this Court did not. The hearing officer has first-hand knowledge from a front row

seat, but this Court is reading about it later, on a cold record.

A reviewing court may reverse a symptom assessment only when it is "patently wrong."

*Id.* at 816; *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015); *Turner v. Astrue*, 390 F. App'x

581, 587 (7th Cir. 2010) (describing the "patently wrong" standard as a "high burden"). "Only when an ALJ's assessment lacks any explanation or support will a court declare it to be 'patently wrong.'" *Frank S. v. Kijakazi*, 2022 WL 832660, at *7 (N.D. Ill. 2022) (citing *Elder*, 529 F.3d at 413–14).

First, Fonseca takes issue with the ALJ's treatment of her back and hand pain. *See* Pl.'s Mem., at 13 (Dckt. No. 20). Fonseca argues that the ALJ incorrectly conflated her trigger finger pain with her carpal and cubital tunnel syndrome pain when finding that Fonseca's "claims of debilitating back and hand pain (trigger finger pain) [were] 'not consistent with treatment records.'" *Id.* Fonseca says that she had a history of trigger finger pain that the ALJ ignored, citing to two instances of treatment in 2016 and 2017. *Id.*

Ultimately, the ALJ properly considered her subjective allegations of trigger finger pain. In addition to discussing the objective medical evidence, the ALJ addressed the relevant regulatory factors. *See* 11/6/2018 ALJ Decision (Dckt. No. 10-1, at 33–35 of 876). The ALJ even discussed Fonseca's trigger finger treatment in 2016 and 2017, reasoning that she only sought "routine and conservative" treatment. *Id.* at 35.

The fact that a claimant received treatment isn't enough to get her over the hump. "Not all treatments support finding a claimant's pain allegations credible; to the contrary, an ALJ may discount a claimant's allegations based on [her] reliance on 'routine and conservative' treatment." *See Vincent A. v. Berryhill*, 2019 WL 2085104, at *12 (N.D. Ill. 2019). And physical therapy and cortisone injections are generally conservative in nature. *See Schomas v. Colvin*, 732 F.3d 702, 709 (7th Cir. 2013) (characterizing physical therapy as conservative treatment); *Gilman v. Corizon Health, Inc.*, 818 F. App'x 531, 532–33 (7th Cir. 2020) (characterizing cortisone injections as conservative treatment).

25

Importantly, the ALJ considered later medical evidence documenting that Fonseca had full grip strength and no pain. *See* 11/6/2018 ALJ Decision (Dckt. No. 10-1, at 35 of 876); *see also* Medical Records (Dckt. No. 10-1, at 512, 751 of 876). In fact, Fonseca even testified that her medication reduced her pain, and she reported that her pain only impacted her daily activities "a little." *See* 11/6/2018 ALJ Decision, at 33–34; *see also* Medical Records, at 61, 798.

After considering the full record, and looking at the ALJ's reasoning, this Court cannot find that the ALJ was "patently wrong." Instead, the ALJ went through all of the evidence and determined that Fonseca's allegations of debilitating trigger finger pain were not consistent with the facts in the record.

Additionally, when discussing trigger finger pain, Fonseca further argues that the ALJ incorrectly failed to impose reaching or handling limitations for her carpal tunnel pain. *See* Pl.'s Mem., at 13 (Dckt. No. 20). But this is not a case where the ALJ failed to mention important evidence. *Cf. Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). In fact, the ALJ detailed Fonseca's carpal tunnel and cubital tunnel syndrome diagnoses and her allegations of pain. And despite Fonseca's argument that the ALJ should have imposed a limitation based on her carpal tunnel and cubital tunnel, none of her doctors recommended any limitations due to the conditions. *See Best*, 730 F. App'x at 382 ("There is no error when there is 'no doctor's opinion contained in the record [that] indicated greater limitations than those found by the ALJ.'") (quoting *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004)). So, her argument about her carpal tunnel pain doesn't move the needle, either.

Second, Fonseca argues that the ALJ improperly discounted her allegations that she walked with a limp and could not use a cane. *See* Pl.'s Mem., at 14 (Dckt. No. 20). But on that point, there's not much to go on. Fonseca concedes that "a limp is not documented in the

26

record." *Id.* In fact, the ALJ emphasized that the record documented that Fonseca exhibited a normal gait. *See* 11/6/2018 ALJ Decision (Dckt. No. 10-1, at 34 of 876). Not only is there no medical evidence to support Fonseca's allegation of a limp, but there is also objective evidence disproving that allegation.

Without establishing that she needed some walking support (like a cane), Fonseca's ability to grip a cane is irrelevant. There is no need to grip a cane if she doesn't need a cane. As a result, the ALJ did not "patently err" in considering her allegations about limping and needing a cane either.

Finally, Fonseca takes issue with the ALJ's treatment of her vision issues. *See* Pl.'s Mem., at 15 (Dckt. No. 20). She argues that the ALJ failed to "indicate whether she believed Ms. Fonseca had significant limitations with her vision, due to blurriness, large floaters, throbbing pain, fluid, and a white glow in both eyes." *Id.*

Fonseca is not arguing that the ALJ failed to assess her subjective testimony about her vision. In fact, the ALJ expressly discussed her vision issues, calling attention to the fact that Fonseca "did not testify to having any other vision limits, other than driving." *See* 11/6/2018 ALJ Decision (Dckt. No. 10-1, at 34 of 876). Instead, Fonseca is arguing that the ALJ should have further opined on her vision limitations.

The ALJ was not "patently wrong" in her treatment of Fonseca's vision issues. Fonseca did not testify to limitations based on her vision, other than driving. *Id.* And her doctors didn't recommend any vision limitations either. *Id.* There *are no* subjective allegations about vision. The ALJ did not ignore or discount any subjective allegations about vision, because there was nothing to ignore.

27

And while the ALJ did not limit Fonseca from driving on the job, the ALJ explicitly noted that she did not rely on any jobs that required driving, in part because Fonseca has never driven.  *Id.*  As a result, the ALJ was not "patently wrong" in her assessment of Fonseca's subjective allegations about her vision either.

## Conclusion

For the foregoing reasons, the Court denies Plaintiff Fonseca's motion for summary judgment, and grants Defendant's motion for summary judgment.  The decision to deny benefits is hereby affirmed.

Date:  May 20, 2022

Steven C. Seeger
United States District Judge